**GREGORY T. MURPHY**
California State Bar No. 245505
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: gregory_murphy@fd.org

Attorneys for Rodney Parker

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08CR0854-LAB-01 |
| Plaintiff, | DATE:        May 5, 2008<br>TIME:        2:00 p.m. |
| v. | **NOTICE OF MOTIONS & MOTIONS TO:** |
| RODNEY PARKER, | **M)    DISMISS INDICTMENT DUE TO IMPROPER JURY INSTRUCTIONS; AND** |
| Defendant. | **N)    DISMISS INDICTMENT DUE TO UNCONSTITUTIONAL DRUG STATUTE** |

TO:    KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
         JOSEPH J.M. ORABONA, ASSISTANT UNITED STATES ATTORNEY:

        PLEASE TAKE NOTICE that, on May 5, 2008, at 2:00 p.m., or as soon thereafter as counsel may be heard, the defendant, Rodney Parker, by and through his counsel, Gregory T. Murphy and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

**MOTIONS**

        The defendant, Rodney Parker, by and through his attorneys, Gregory Murphy and Federal Defenders of San Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this Court for an order to:

        M)    Dismiss Indictment Due to Improper Jury Instructions; and

        N)    Dismiss Indictment Due to Unconstitutional Drug Statute

1      These motions are based upon the instant motions and notice of motions, the attached statement of

2 facts and memorandum of points and authorities, and all other materials that may come to this Court's

3 attention at the time of the hearing on these motions.

4                                                      Respectfully submitted,

5

6 DATED:          April 14, 2008                       /s/ Gregory T. Murphy
                                                       **GREGORY T. MURPHY**
7                                                      Federal Defenders of San Diego, Inc.
                                                       Attorneys for Rodney Parker

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **GREGORY T. MURPHY**
   California State Bar No. 245505
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, CA 92101-5008
   (619) 234-8467/Fax: (619) 687-2666
4  E-Mail: gregory_murphy@fd.org

5  Attorneys for Rodney Parker

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                   (HONORABLE LARRY A. BURNS)

11  UNITED STATES OF AMERICA,           )   Case No. 08CR0854-LAB-01
                                         )
12            Plaintiff,                 )   DATE:       May 5, 2008
                                         )   TIME:       2:00 p.m.
13  v.                                   )
                                         )   **MEMORANDUM OF POINTS AND**
14  RODNEY PARKER,                       )   **AUTHORITIES IN SUPPORT OF**
                                         )   **MR. PARKER'S MOTIONS**
15            Defendant.                 )
    _____)   **EVIDENTIARY HEARING REQUESTED**
16

17  **M.      The Indictment Should Be Dismissed Because This Court's Instructions as a Whole Provided**
            **to the January 2007 Grand Jury Run Afoul of Both *Navarro-Vargas* and *Williams* and Violate**
18          **the Fifth Amendment by Depriving Mr. Parker of the Traditional Functioning of the Grand**
            **Jury**

19

20          **1.      Introduction**

21          The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 11.  That

22  grand jury was instructed by this Court on January 11, 2007.  See Reporter's Partial Transcript of the

23  Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  This Court's

24  instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases

25  challenging a form grand jury instruction previously given in this district in several ways.[1]  These instructions

26  _____

27          [1] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States
    v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005)
28  (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-
    Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

                                        3

1  compounded this Court's erroneous instructions and comments to prospective grand jurors during voir dire

2  of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of

3  Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[2]

4        **2.    This Court Instructed Grand Jurors That Their Singular Duty Is to
              Determine Whether or Not Probable Cause Exists and That They Have
5             No Right to Decline to Indict When the Probable Cause Standard Is
              Satisfied**

6

7        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

8  responsibility, see Ex. A at 3, 3-4, 5,[3] this Court instructed the grand jurors that they were forbidden "from

9  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

10 federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

11 at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

12 judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

13 though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

14 be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

15 because the grand jurors disagree with a proposed prosecution.

16       Immediately before limiting the grand jurors' powers in the way just described, this Court referred

17 to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

18       I've gone over this with a couple of people.  You understood from the questions and
         answers that a couple of people were excused, I think three in this case, because they could
19       not adhere to the principle that I'm about to tell you.

20 Id.  That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

21 disagreement with Congress.  See id. at 8-9.  Thus, this Court not only instructed the grand jurors on his view

22 of their discretion; this Court enforced that view on pain of being excused from service as a grand juror.

23 / / /

24

25       [2]  The transcript of the voir dire indicates that grand jurors were shown a video
26 presentation on the role of the grand jury.  Mr. Parker requests that the video presentation be
   produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he
27 proceedings before the grand jury are secret, but the ground rules by which the grand jury
   conducts those proceedings are not.").

28
         [3]  See also id. at 20 ("You're all about probable cause.").

4

1    Examination of the recently disclosed voir dire transcript, which contains additional instructions and

2    commentary in the form of the give and take between this Court and various prospective grand jurors, reveals

3    how this Court's emphasis of the singular duty is to determine whether or not probable cause exists and his

4    statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely

5    compounded an erroneous series of instructions already given to the grand jury venire.  In one of this Court's

6    earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause

7    determination.

8    [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
     crime was committed?  And second, do we have a reasonable belief that the person that
9    they propose that we indict committed the crime?"

10   If the answer is "yes" to both of those, then the case should move forward.  If the answer
     to either of the questions is "no," then the grand jury should not hesitate and not indict.

11

12   See Ex. B at 8.  In this passage, this Court twice uses the term "should" in a context makes clear that the term

13   is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the

14   obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has

15   no "reasonable belief that the person that they propose that we indict committed the crime."

16   Equally revealing are this Court's interactions with two potential grand jurors who indicated that, in

17   some unknown set of circumstances, they might decline to indict even where there was probable cause.

18   Because of the redactions of the grand jurors' names, Mr. Parker will refer to them by occupation.  One is a

19   retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

20   CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

21   an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

22   cases.  See id.

23   This Court did not determine what sorts of drug and immigration cases troubled the CSW.  This

24   Court did not inquire as to whether the CSW was at all troubled by the sorts of cases actually filed in this

25   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

26   Rather, this Court provided instructions suggesting that, in any event, any scruples CSW may have possessed

27   were simply not capable of expression in the context of grand jury service.

28   / / /

1    Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to
2    a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I*
3    *wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go
4    forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

5

6    See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, this Court let the grand juror

7    know that he would not want him or her to decline to indict in an individual case where the grand juror

8    "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

9    Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

10    manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

11    charge even if [the CSW] thought the evidence warranted it."  See id.  Again, this Court's question provided

12    no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

13    amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

14    listening to this exchange could only conclude that there was *no* case in which This Court would permit them

15    to vote "no bill" in the face of a showing probable cause.

16    Just in case there may have been a grand juror that did not understand his or her inability to exercise

17    anything like prosecutorial discretion, this Court drove the point home in his exchange with REA.  REA first

18    advised This Court of a concern regarding the "disparity between state and federal law" regarding "medical

19    marijuana."  See id. at 24.  This Court first sought to address REA's concerns about medical marijuana by

20    stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

21    Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
22    cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.  We want you to make a business-like decision of
23    whether there was a probable cause. . . .

24    Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, This Court went

25    on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

26    In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

27    That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

28    juror is obligated to vote to indict if there is probable cause.

6

1  I can tell you sometimes I don't agree with some of the legal decisions that are indicated
   that I have to make. But my alternative is to vote for someone different, vote for someone
2  that supports the policies I support and get the law changed. It's not for me to say, "well,
   I don't like it. So I'm not going to follow it here."

3
4  You'd have a similar obligation as a grand juror even though you might have to grit your
   teeth on some cases. Philosophically, if you were a member of congress, you'd vote
   against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote
5  against criminalizing some drugs.

6  That's not what your prerogative is here. You're prerogative instead is to act like a judge
   and say, "all right. This is what I've to deal with objectively. Does it seem to me that a
7  crime was committed? Yes. Does it seem to me that this person's involved? It does." *And
   then your obligation, if you find those to be true, would be to vote in favor of the case going*
8  *forward.*

9  Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

10 questions are answered in the affirmative, lead to an "obligation" to indict.

11     Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

12 paradigm, this Court then ensured that there was no chance of a deviation from the obligation to indict in

13 every case in which there was probable cause.

14     The Court:     Do you think you'd be inclined to let people go in drug cases even though
                      you were convinced there was probable cause they committed a drug
15                    offense?

16     REA:           It would depend on the case.

17     The Court:     Is there a chance that you would do that?

18     REA:           Yes.

19     The Court:     I appreciate your answers. I'll excuse you at this time.

20 Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

21 political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

22 should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

23 indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, this Court

24 made no effort to explore REA's views; this Court did not ascertain what sorts of cases would prompt REA

25 to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

26 because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4]

27 ─────────────────────

28     [4] This point is underscored by this Court's explanation to the Grand Jury that a magistrate
   judge will have determined the existence of probable cause "in most circumstances" before it has

1  See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great

2  a risk to run.

3  **3.     The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
          Exculpatory Evidence.**

4

5      In addition to his instructions on the authority to choose not to indict, this Court also assured the

6  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex.

7  A at 20.[5]

8  ───────────────────────

9  been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of

10 finding probable cause in each case because had a magistrate judge not so found, the case likely
   would not have been presented to the Grand Jury for indictment at all. The Grand Jury was

11 informed that it merely was redundant to the magistrate court "in most circumstances." See id.
   This instruction made the grand jury more inclined to indict irrespective of the evidence

12 presented.

13    [5] These instructions were provided in the midst of several comments that praised the
   United States attorney's office and prosecutors in general. This Court advised the grand jurors

14 that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,
   they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at

15 27. The instructions delivered during voir dire go even further. In addressing a prospective
   grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring,"

16 see Ex. B at 38, This Court affirmatively endorsed the prospective juror's view of the U.S.

17 Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are
   saying. They make sense to me." See id. at 43. See also id. at 40 ("You're saying that you

18 give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not
   about the business of trying to indict innocent people or people that they believe to be innocent or

19 the evidence doesn't substantiate the charges against.").

20    This Court's discussion of his once having been a prosecutor before the Grand Jury

21 compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10.
   This Court's instructions implied that as a prior prosecutor and current "jury liaison judge," see

22 id. at 8, he would not allow the government attorneys to act inappropriately or to present cases

23 for indictment where no probable cause existed.

24    In addition, while this Court instructed the Grand Jury that it had the power to question

25 witnesses, This Court's instructions also told the Grand Jury that it should "be deferential to the
   U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be

26 asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's
   independence is diluted by [such an] instruction, which encourages deference to prosecutors."

27 Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
   see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow

28 instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand
   jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify

1   Now, again, this emphasizes the difference between the function of the grand jury and the
2   trial jury. You're all about probable cause. If you think that there's evidence out there that
    might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
    you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3   *duty-bound to present evidence that cuts against what they may be asking you to do if*
    *they're aware of that evidence.*

4

5   Id. (emphasis added).

6         The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, This Court

8   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9   adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus,

10  this Court unequivocally advised the grand jurors that the government would present any evidence that was

11  "adverse" or "that cuts against the charge." See id.

12        **4.    Navarro-Vargas Establishes Limits on the Ability of Judges to
           Constrain the Powers of the Grand Jury, Which This Court Far
13         Exceeded in His Instructions as a Whole During Impanelment.**

14        The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15  grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17  approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

18  the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

19  jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January

20  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

21  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

22  exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United

23  States v. Williams, 504 U.S. 36, 49 (1992).

24

25

26  whether they understood the instruction as given and then followed it.").

27       [6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
    majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28  imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand
    jury's constitutional independence.").

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

1  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

2  But not in This Court's instructions.

3      **5.**    **This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

4

5      The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

6  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

7  in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

8  finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

9  1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

10  pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

11  the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,

12  and thus to circumscribe the grand jury's constitutional independence.").  <u>See also</u> <u>id.</u> ("The 'word' should is

13  used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579

14  (1999) (brackets in original)).

15      The debate about what the word "should" means is irrelevant here; the instructions here make no

16  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

17  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

18  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

19  indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. A at 8-9.  Thus, the instruction flatly

20  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

21  would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>,

22  474 U.S. at 264.

23      While this Court used the word "should" instead of "shall" during voir dire with respect to whether

24  an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is clear that he could only

25  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, this Court not only

26  told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable

27  cause, "then the grand jury should hesitate and not indict." <u>See id.</u> at 8.  At least in context, it would strain

28  credulity to suggest that this Court was using "should" for the purpose of "leaving room for the grand jury to

1   [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly this Court was

2   not.

3        The full passage cited above effectively eliminates any possibility that this Court intended the

4   Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
> crime was committed?  And second, do we have a reasonable belief that the person that
> they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer
> to either of the questions is "no," then the grand jury should not hesitate and not indict.

9   See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that

10  if there is no probable cause, you *should* not indict. This Court did not intend to "leav[e] room for the grand

11  jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci,

12  299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g.,

13  United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include

14  both the determination whether there is probable cause and the protection of citizens against unfounded

15  criminal prosecutions.") (citation omitted).

16        By the same token, if this Court said that "the case should move forward" if there is probable cause,

17  but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

18  Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two

19  different meanings of the word "should" in the space of two consecutive sentences. That could not have been

20  this Court's intent. But even if it were, no grand jury could ever have had that understanding.[7] Jurors are not

21  presumed to be capable of sorting through internally contradictory instructions. See generally United States

22  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

23  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

---

27   [7] This argument does not turn on Mr. Parker's view that the Navarro-Vargas/Marcucci
28   reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on
     the context in which the word is employed by this Court in his unique instructions, context which
     eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly

2 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3    **(1)**    The first occasion occurred in the following exchange when this Court conducted voir dire

4 and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
> you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
> is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
> your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
>
> Prospective Juror: Well, I think I may fall in that category.
>
> The Court: In the latter category?
>
> Prospective Juror: Yes.
>
> The Court: Where it would be difficult for you to support a charge even if you thought the
> evidence warranted it?
>
> Prospective Juror: Yes.
>
> The Court: I'm going to excuse you then.

14 See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

15 juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

16 "should go forward" and this Court expressly disapproved of any vote that might prevent that.  See id. ("I

17 wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

18 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

19 the exercise of discretion by any other prospective grand juror.

20    **(2)**    In an even more explicit example of what "should" meant, This Court makes clear that it there

21 is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

> Court   . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."
>
> You'd have a similar *obligation* as a grand juror even though you might have to grit your
> teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote
> against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
> against criminalizing some drugs.
>
> That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
> to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a
> crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."
> *And then your obligation, if you find those things to be true, would be to vote in favor of
> the case going forward*.

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that this Court's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But This Court did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)**    As if the preceding examples were not enough, this Court continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." See id. at 61.

**(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, this Court reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, This Court advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.

The Court:  In what regard?

Prospective Juror: Specifically, medical marijuana.

1    The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*
2    *course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like
3    decision of whether there was a probable cause. ...

4    See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause"

5    would obviously leave no role for the consideration of penalty information.

6    The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

7    penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

8    United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

9    reasons. First, This Court did not use the term "should" in the passage quoted above. Second, that context,

10   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

11   ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized

12   consideration of penalty information. See 474 U.S. at 263.

13   Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time

14   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

15   was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

16   contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

17   juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

18   Vasquez:

19   The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the
20   power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the
21   basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

22

23   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

24   dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

25   initial decision to indict, but also significant decisions such as how many counts to charge and whether to

26   charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

27   would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

28   id. at 264. This Court's grand jury is not Vasquez's grand jury. The instructions therefore represent structural

1   constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury

2   proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore

3   be dismissed. Id.

4          The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

5   instructions excesses.   The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

6   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

7   408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

8   jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at

9   1202 (emphases in the original).

10          Judge Hawkins sharply criticized this approach.   The majority, he explains, "believes that the

11   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

12   of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

13   flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

14   making a probable cause determination ... unconstitutionally undermines the very structural protections that

15   the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

16   that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

17   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

18   in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

19   instructions because nothing will happen if they disobey them." Id.

20          In setting forth Judge Hawkins' views, Mr. Parker understands that this Court may not adopt them

21   solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

22   Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

23          Here, again, the question is not an obscure interpretation of the word "should", especially in light of

24   the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the Court

25   in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right

26   to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

27   Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

28   / / /

1    This Court did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

2    they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

3    prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  <u>See</u> Ex.

4    A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

5    grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

6    of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

7    exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of government

8    by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d 1061, 1066 &

9    n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

10   initiative, rules of grand jury procedure." <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992).  This Court did

11   so here.

12   **6.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No**
       **Duty to Present Exculpatory Evidence to the Grand Jury.**

13

14   In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

15   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

16   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

17   common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

18   judicial authority exists." <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

19   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

20   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

21   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does

22   not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47

23   (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative,

24   rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's claim, both

25   as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

26   Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

27   present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

28   / / /

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that This Court had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, this Court informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

/ / /

/ / /

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**N.    The Indictment must Be Dismissed Because the Drug Statutes Are Facially Unconstitutional Or, in the Alternative, the Indictment Fails to Allege That Mr. Parker Was Aware of the Amount and Type of Drugs**

**1.    The Statutes Are Unconstitutional.**

"[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Nordby, 225 F.3d 1053, 1057-58 (9th Cir. 2000). Clearly, in enacting 21 U.S.C. §§ 841, 952, and 960, Congress intended to do precisely what Apprendi forbids: it made the type and quantity of the controlled substance "a sentencing factor, not an element of the crime under [the statutes]; the statute[s are] not susceptible to a contrary interpretation." Nordby, 225 F.3d at 1058. Because there is no ambiguity, the doctrine of constitutional doubt does not apply. See Miller v. French, 530 U.S. 327, 120 S. Ct. 2246, 2255 (2000).

The statutes are not severable; they contain no default sentencing provisions. Subsection (a) of each provision cannot stand alone: they contain no penalty provisions. See Board of Natural Resources v. Brown,

1  992 F.2d 937, 948 (9th Cir. 1993) (asking "whether the [a]ct which remains after the unconstitutional

2  provisions are excised is 'fully operative' . . . whether the unconstitutional provisions are 'functionally

3  independent' from the remainder of the [a]ct").

4          Moreover, this Court may not attempt to uphold the constitutionality of the statutes by attempting

5  to guess what penalties Congress would have imposed if it had known that §§ 841, 952, and 960 were

6  unconstitutional.  Indeed, even if it thinks that it may have a good idea of what Congress may have intended

7  when it passed the constitutionally infirm legislation, this Court may not legislate penalties into a statute that

8  lacks them to avoid finding the statute unconstitutional.  See United States v. Evans, 333 U.S. 483, 486

9  (1948).  There, the Supreme Court rejected the government's request "to make [the statute] effective by

10 applying . . . one of the possibilities which seems most nearly to accord with the criminal proscription and the

11 terms of the penalizing provision." Id.  The Supreme Court refused to "plug the hole in the statute[,]" and

12 concluded that "[t]his is a task outside the bounds of judicial interpretation.  It is better for Congress, and more

13 in accord with its function, to revise the statute than for us to guess at the revision it would make.  That task

14 it can do with precision.  We could do no more than make speculation law." Id. at 495.  If the Supreme Court

15 would not redraft the relatively simple statute in Evans, this Court certainly should not redraft §§ 841, 952,

16 and 960 to include penalty provisions.

17         The Ninth Circuit went to great lengths to join the other circuits and hold that § 841 (and by analogy

18 §§ 952 and 960) does not violate due process.  United States v. Buckland, 277 F.3d 1173 (9th Cir. 2002) (en

19 banc).  In substance, the Ninth Circuit stated that it, and the other Courts of Appeals, had erred in years of

20 precedent that committed findings of type and quantity of controlled substance to the district court at

21 sentencing or punishment.  Buckland, at 1178, n. 2 (citing the various federal circuit courts that had long held

22 that Congress left findings as to type and quantity of controlled substance to the district court at sentencing).

23 Ironically, the Buckland decision turns on what "[§] 841 . . . does not say." Id., at 1179.  In other words, the

24 Buckland court construed § 841 (and by analogy would construe §§ 952 and 960) as constitutional because

25 Congress "did not purposefully remove from the jury the assessment of the facts [necessary to] increase the

26 prescribed range of penalties . . . " Id. at 1181 (internal quotation marks and citation omitted).  Yet, the

27 Buckland court's conclusion ignores the plain language of § 841(b) (as well as that of § 960(a)), see supra,

28 / / /

1  and the rules of statutory construction that it purports to follow.  Buckland, at 1198 (Tashima, J. dissenting).

2  The long awaited Buckland decision makes no sense.

3       The government will no doubt argue that the Buckland decision binds this Court.  Mr. Parker urges

4  this Court to reject the Buckland decision as an example of result oriented jurisprudence that disregards the

5  definition of due process outlined by the Supreme Court in Apprendi.  Apprendi announced a constitutional

6  rule that binds this Court, and this Court must follow it.

7       **2.      If the Statutes Are Constitutional, There Must Be *Mens Rea* as to Type and Quantity.**

8

9       If this Court reinterprets the type and quantity of controlled substance to be offense elements, or the

10  "functional equivalent" of offense elements, that have to be alleged in the indictment, this Court must find

11  that the statute's *mens rea* is equally applicable to these new "elements."  See United States v. X-Citement

12  Video, Inc., 513 U.S. 64 (1994).  Not only must the indictment allege the type and quantity of "controlled

13  substance" involved in the offense, the indictment must allege that the defendant **knew** the type and quantity

14  involved.  And, regardless of what this Court considers the elements of his alleged offense, Mr. Parker has

15  a right to a Grand Jury determination on each one.  See United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir.

16  1999) ("The Fifth Amendment . . . requires that a defendant be convicted only on charges considered and

17  found by a grand jury."); see also id. (reversing because the Ninth Circuit could "only guess whether the grand

18  jury received evidence of, **and actually passed on**, Du Bo's intent.") (emphasis added).

19       The Ninth Circuit issued the case of United States v. Carranza, 289 F.3d 634 (9th Cir. 2002),

20  addressing the issue of *mens rea* as to type and quantity of the controlled substance.  In Carranza, the Court

21  held that "[a] defendant charged with importing or possessing a drug is not required to know the type and

22  amount of drug."  Id. at 644.  The fatal flaw, however, with the Carranza analysis regarding *mens rea* is that

23  it relies upon reasoning that has been rejected by Apprendi, Buckland, and Mendoza-Paz.  See Buckland, 277

24  F.3d at 1181 ("Apprendi's reading of the Due Process Clause has stripped the [] holdings [of this Court's

25  previous decisions construing the drug statutes] of precedential value").  For example, the Carranza decision

26  cites the case of United States v. Ramirez-Ramirez, 875 F.2d 772 (9th Cir. 1989), to support its holding that

27  the government need not prove *mens rea* as to drug type and quantity.  The problem with reliance on that

28  precedent is that it is based on the premise that 841(b) and 960(b) contain only sentencing factors.  Id. at 774

1  n. 1 ("This interpretation is consistent with both statutes, which require knowing possession of a controlled

2  substance under subsection (a), and refer to different types of controlled substances under subsection (b) for

3  sentencing purposes only.").  If, pursuant to the reasoning set forth in Buckland and Mendoza-Paz, sections

4  841(b) and 960(b) now set forth elements of the offenses, then an entirely different analysis applies because,

5  except for a few narrow exceptions, the traditional rule is that a statute's *mens rea* applies to all elements of

6  the offense.  The Carranza decision attempts to avoid this traditional rule.

7          Thus, assuming that this Court upholds the constitutionality of sections 841 & 960, the grand jury

8  should have found that Mr. Parker knew the weight and type of substance.  Because the grand jury made no

9  such finding, this Court should dismiss the counts of the indictment pending against Mr. Parker.

10                                        Respectfully submitted,

11

12  DATED:        April 14, 2008              /s/ Gregory T. Murphy
                                            **GREGORY T. MURPHY**
13                                          Federal Defenders of San Diego, Inc.
                                            Attorneys for Rodney Parker
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28